COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-03-320-CR
  
  
CHESTER 
ALAN SANCHEZ                                                     APPELLANT
 
V.
 
THE 
STATE OF TEXAS                                                                  STATE
 
 
------------
 
FROM 
THE 30TH DISTRICT COURT OF WICHITA COUNTY
 
------------
 
MEMORANDUM OPINION[1]
 
------------
 
I. Introduction
        Appellant 
Chester Alan Sanchez appeals his conviction for capital murder. A jury found 
Sanchez guilty, and the court assessed his punishment at life imprisonment. In 
three points, Sanchez challenges the admission of rebuttal testimony given by 
Dr. Fredrick Mears and the admission of his videotaped confession. We will 
affirm.
II. Procedural 
Background
        During 
questioning in connection with the death of Willie B. Anderson, Sanchez 
confessed on videotape that he intended to kill Anderson during the course of a 
robbery. After being indicted for capital murder, Sanchez filed a written motion 
to suppress any recorded conversation he had with law enforcement officers and a 
Jackson v. Denno[2] motion to determine the 
admissibility of his confession. The trial court conducted a Jackson v. Denno 
hearing and determined that Sanchez’s confession was voluntarily made. During 
the trial, the jury watched the videotaped confession and listened to expert 
testimony regarding Sanchez’s level of intellectual functioning, which the 
trial court admitted solely for the purpose of assisting the jury in determining 
the voluntariness of Sanchez’s confession. Thereafter, the jury found Sanchez 
guilty of capital murder.
III. Dr. 
Mears’s Testimony Was Properly Admitted
        In 
its case-in-chief, the defense called Dr. Leon Morris. He had given Sanchez 
several intelligence tests, which, in his opinion, showed that Sanchez was 
functioning at the sixth percentile for people his age. Dr. Morris testified 
that Sanchez is not mentally retarded and that his scores were consistent with 
borderline intellectual functioning.[3]  At the 
conclusion of Dr. Morris’s testimony, the trial court told the jury that Dr. 
Morris’s testimony regarding Sanchez’s level of intellectual functioning was 
admitted “solely for the purpose of assisting [the jury], if it does, in 
determining the voluntariness of [Sanchez’s] statement given to Officer 
Rutledge.”
        Afterwards, 
the defense called Sanchez to give his version of the events surrounding the 
robbery and death of Anderson.  During his testimony, Sanchez admitted that 
he stated during his videotaped confession that he had intended to kill 
Anderson.  However, he testified that his videotaped statement was not true 
and that he “just told [the police] what they wanted to hear.”
        Thereafter, 
the State called Dr. Mears to rebut Dr. Morris’s testimony regarding 
Sanchez’s level of intellectual functioning.  Dr. Mears had reviewed 
Sanchez’s scores from previous intelligence testing, as well as his school 
records, performed a standard mental status examination, and interviewed 
Sanchez. Dr. Mears disagreed that Sanchez was in the sixth percentile with 
regard to his ability to give a voluntary confession. Instead, he concluded that 
Sanchez’s adaptive functioning was excellent, stating that Sanchez “had the 
intellectual abilities and adaptive and social intelligence to do quite well and 
think well on his feet and talk well and communicate with other people.” Dr. 
Mears further stated that Sanchez’s score in adaptive functioning was higher 
than the scores of some college students. At the conclusion of Dr. Mears’s 
testimony, the trial court told the jury that Dr. Mears’s testimony 
“regarding [Sanchez’s] level of intellectual functioning, social 
intelligence, and/or adaptive functioning was admitted . . . solely for the 
purpose of assisting [the jury], if it does, in determining the voluntariness of 
[Sanchez’s] statement given to Officer Rutledge.”
        A.     Testimony 
Regarding Level of Intellectual Functioning Was Proper
        In 
his first point, Sanchez argues that the trial court abused its discretion in 
admitting Dr. Mears’s rebuttal testimony because his testimony concerning 
Sanchez’s level of intellectual functioning was unreliable and unsupported by 
proper methodology.
        The 
test for admitting expert testimony is set forth in rule 702:
 
If 
scientific, technical, or other specialized knowledge will assist the trier of 
fact to understand the evidence or to determine a fact in issue, a witness 
qualified as an expert by knowledge, skill, experience, training, or education 
may testify thereto in the form of an opinion or otherwise.
 
 
Tex. R. Evid. 702. The burden of 
establishing a witness’s qualifications lies with the party offering the 
testimony. Matson v. State, 819 S.W.2d 839, 851 (Tex. Crim. App. 1991). 
No rigid formula exists for determining whether a particular witness is 
qualified to testify as an expert. Id. at 851 n.10. The special knowledge 
qualifying a witness as an expert may be gleaned entirely from studying 
technical works, obtaining a specialized education, practical experience, or a 
combination of the three. Holloway v. State, 613 S.W.2d 497, 501 (Tex. 
Crim. App. 1981). Consequently, the question of whether a witness offered as an 
expert possesses the required qualifications rests largely in the trial 
court’s discretion. Wyatt v. State, 23 S.W.3d 18, 27 (Tex. Crim. App. 
2000); see also Tex. R. Evid. 
702. Absent an abuse of discretion, the trial court’s decision to admit or 
exclude testimony will not be disturbed. Wyatt, 23 S.W.3d at 27.
        Here, 
the State established that Dr. Mears, based on his education and professional 
training, was fully qualified to render expert testimony on Sanchez’s mental 
capabilities.[4]  See Perez v. State, 113 
S.W.3d 819, 834 (Tex. App.—Austin 2003, pet. ref’d) (recognizing that 
“[e]xperience alone may provide a sufficient basis for an expert’s 
testimony”). However, under Daubert[5] and 
its Texas progeny, gauging the reliability of expert evidence requires further 
analysis.  Hernandez v. State, 53 S.W.3d 742, 750 (Tex. 
App.—Houston [1st Dist.] 2001, pet. ref’d).  Because the evidence 
offered by Dr. Mears related to social science or a field that is based 
primarily on experience and training as opposed to the scientific method, we are 
mindful that the Daubert factors “do not necessarily apply outside of 
the hard science context.” Nenno v. State, 970 S.W.2d 549, 561 (Tex. 
Crim. App. 1998), overruled on other grounds by, State v. Terrazas, 
4 S.W.3d 720, 272 (Tex. Crim. App. 1999). Instead, the appropriate inquiry 
involves the following questions: (1) whether the field of expertise is a 
legitimate one, (2) whether the subject matter of the expert’s testimony is 
within the scope of that field, and (3) whether the expert’s testimony 
properly relies upon and/or utilizes the principles involved in the field. Id.
        Dr. 
Mears’s field of expertise, psychology, is certainly legitimate as recognized 
by the Texas Court of Criminal Appeals’ approval of psychological expert 
testimony. See Tiede v. State, 76 S.W.3d 13, 13-14 (Tex. Crim. App. 2002) 
(psychological expert provided testimony during punishment stage of trial on 
clinical disorders involving dissociation and was prepared to give testimony on 
“sudden passion,” appellant’s future dangerousness, and appellant’s 
behavior after offense); Griffith v. State, 983 S.W.2d 282, 288 (Tex. 
Crim. App. 1998) (FBI agent, who was formerly a psychologist at maximum security 
prison, was allowed to testify about appellant’s future dangerousness), cert. 
denied, 528 U.S. 826 (1999). Because of Dr. Mears’s training, experience, 
and superior knowledge concerning the mental competency of criminals, the 
question of whether Sanchez had borderline intellectual functioning is clearly a 
matter within the scope of Dr. Mears’s expertise. See Hernandez, 53 
S.W.3d at 751 (stating that “Child Abuse Accommodation Syndrome” and common 
characteristics of sexually abused children were matters within scope of 
expert’s expertise where expert had superior knowledge concerning behavior of 
children who had suffered sexual abuse); see also Nenno, 970 S.W.2d at 
562 (stating that through interviews, case studies, and statistical research, 
person may acquire, as result of such experience, superior knowledge concerning 
behavior of sexual offenders). Furthermore, Dr. Mears’s testimony during voir 
dire underscored the fact that the procedures he used to evaluate Sanchez were 
procedures “that psychologists throughout American [sic] would accept when it 
comes to an IQ.”[6] Consequently, Dr. Mears’s 
expert opinion—which relied upon his review of Sanchez’s intelligence test 
scores and school records, his analysis of Sanchez’s performance on a standard 
mental status examination, and his interview with Sanchez—properly relied upon 
and utilized principles involved in the field. See Hernandez, 53 S.W.3d 
at 751 (stating that expert’s unimpeached testimony during voir dire 
underscored fact that her data and opinions were recognized by general community 
of psychology and psychiatry, demonstrating proper reliance on accepted 
principles in her field).
        Because 
Dr. Mears was qualified to give expert testimony and his testimony met the Nenno 
factors, the trial court did not abuse its discretion in admitting his rebuttal 
testimony. See id.; cf. Nenno, 970 S.W.2d at 562 (stating that to 
the extent factfinder could decide that absence of peer review cast doubt on 
credibility of testimony, such affects weight of evidence rather than 
admissibility). We overrule Sanchez’s first point.
        B.     Sixth 
Amendment Right to Counsel Was Not Violated by Dr. Mears’s Examination and 
Testimony

        In 
his second point, Sanchez claims that the trial court abused its discretion and 
erred in admitting the rebuttal testimony of Dr. Mears because Dr. Mears’s 
testimony concerning Sanchez’s statements was obtained in violation of his 
Sixth Amendment right to counsel. A thorough review of the record reveals that 
Dr. Mears did not give testimony concerning any statement made by Sanchez; 
instead, Dr. Mears limited his testimony to his opinion regarding Sanchez’s 
level of intellectual functioning. Consequently, it appears that Sanchez’s 
second point should be overruled.
        Nonetheless, 
giving a liberal construction to Sanchez’s second point,[7] 
he complains generally that the psychiatric examination performed by Dr. Mears 
violated his Sixth Amendment right to counsel. After thoroughly reviewing the 
record, we are unable to locate an objection to Dr. Mears’s testimony stating 
that his examination violated Sanchez’s Sixth Amendment right to 
counsel.  Instead, the record reflects that Sanchez objected to the 
admissibility of Dr. Mears’s testimony based on lack of notice regarding Dr. 
Mears’s psychiatric examination of Sanchez. Because Sanchez’s objection at 
trial does not comport with his complaint on appeal, nothing is preserved for 
review. See Turner v. State, 805 S.W.2d 423, 431 (Tex. Crim. App.), cert. 
denied, 502 U.S. 870 (1991). We overrule Sanchez’s second point.
IV. Sanchez’s 
Confession Was Voluntary
        In 
his third point, Sanchez contends that the trial court erred in overruling his 
motion to suppress the videotaped confession and admitting the confession into 
evidence because the confession was not given after a voluntary, knowing, and 
intelligent waiver of his rights. Specifically, Sanchez complains that no valid 
waiver appears on the videotape, that the police used coercive interrogation 
tactics, and that he did not have the mental acumen to make a voluntary 
confession. The State responds that Sanchez’s level of intellectual 
functioning, coupled with his experience with the criminal justice system,[8] leads to the conclusion that the trial court did not err 
in finding the confession voluntary.
        We 
review a trial court’s ruling on a motion to suppress evidence under a 
bifurcated standard of review. Carmouche v. State, 10 S.W.3d 323, 327 
(Tex. Crim. App. 2000); Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim. 
App. 1997). In reviewing the trial court’s decision, we do not engage in our 
own factual review. Romero v. State, 800 S.W.2d 539, 543 (Tex. Crim. App. 
1990); Best v. State, 118 S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, 
no pet.). At a suppression hearing, the trial judge is the sole trier of fact 
and judge of the credibility of the witnesses and the weight to be given their 
testimony. State v. Ross, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). 
Therefore, we give almost total deference to the trial court's rulings on (1) 
questions of historical fact and (2) application-of-law-to-fact questions that 
turn on an evaluation of credibility and demeanor. Johnson v. State, 68 
S.W.3d 644, 652-53 (Tex. Crim. App. 2002); Best, 118 S.W.3d at 861-62. 
However, we review de novo a trial court’s rulings on mixed questions of law 
and fact if they do not turn on the credibility and demeanor of witnesses. Johnson, 
68 S.W.3d at 652-53.
        In 
determining whether the trial court’s decision is supported by the record, we 
generally consider only evidence adduced at the suppression hearing because the 
ruling was based on it rather than evidence introduced later. Rachal v. State, 
917 S.W.2d 799, 809 (Tex. Crim. App.), cert. denied, 519 U.S. 1043 
(1996); Green v. State, 78 S.W.3d 604, 608 (Tex. App.—Fort Worth 2002, 
no pet.). Nevertheless, this general rule is inapplicable where the suppression 
issue is consensually relitigated by the parties during the trial on the merits. 
Rachal, 917 S.W.2d at 809; Green, 78 S.W.3d at 608. Where the 
State raises the issue at trial, either without objection or with subsequent 
participation in the inquiry by the defense, the defendant has made an election 
to re-open the evidence, and consideration of the relevant trial testimony is 
appropriate in our review. Rachal, 917 S.W.2d at 809.
        In 
the instant case, during trial, the trial court granted Sanchez a running 
objection to the evidence at issue during the suppression hearing; therefore, we 
would normally limit our scope of review to the evidence presented at the 
suppression hearing. See James v. State, 102 S.W.3d 162, 170 (Tex. 
App.—Fort Worth 2003, pet. ref’d). However, Sanchez secured a charge 
instruction regarding the voluntariness of his confession, telling the jury
 
that 
unless you believe from the evidence beyond a reasonable doubt that the 
statement or confession of Chester Alan Sanchez introduced into evidence was 
freely and voluntarily given by Chester Alan Sanchez without improper influence 
including but not limited to your consideration of all relevant factors such as 
any deception or misrepresentation by the police, intelligence of the defendant, 
any questioning of the defendant over a prolonged period of time without 
allowing him to contact his wife, attorney, or any other family member or the 
consideration of any other improper compulsion or improper persuasion, or if you 
have a reasonable doubt thereof, then you shall wholly disregard the statement 
or confession and not consider such statement or confession for any purpose nor 
any of the evidence obtained as a result thereof, including the videotape played 
to you during the course of this trial.
 
Therefore, 
we review the entire record, not just the record made at the suppression 
hearing, to determine whether the confession was voluntary. Licon v. State, 
99 S.W.3d 918, 922 (Tex. App.—El Paso 2003, no pet.).
        The 
statement of an accused may be used in evidence against him if it appears that 
it was freely and voluntarily made without compulsion or persuasion. Wyatt, 
23 S.W.3d at 23; see also Tex. 
Code Crim. Proc. Ann. art. 38.21 (Vernon 1979). The mere fact that a 
defendant is uneducated and illiterate does not mean that he does not understand 
the nature of the rights he is waiving and cannot voluntarily give a confession. 
Peacock v. State, 819 S.W.2d 233, 235 (Tex. App.—Austin 1991, no pet.). 
“The determination of whether a confession is voluntary is based on an 
examination of the totality of circumstances surrounding its acquisition.” Wyatt, 
23 S.W.3d at 23; Penry v. State, 903 S.W.2d 715, 744 (Tex. Crim. App.), cert. 
denied, 516 U.S. 977 (1995).
        The 
trial court made the following written findings with regard to Sanchez’s July 
14, 2001 videotaped statement:
 
1.The 
statement was the result of a custodial interrogation of the Defendant by 
members of the Wichita Falls Police Department;
 
2.An 
electronic recording, namely a video tape, was made of the statement;
 
3.Prior 
to making the statement, the Defendant received the warnings set out in Article 
38.22, Section 2, of the Code of Criminal Procedure’ [sic] initially by 
Justice of the Peace, Mike Little and subsequently by Officer William Rutledge 
of the Wichita Falls Police Department;
 
4.The 
warnings given by Judge Little are audible on the video tape although the 
Defendant and Judge [L]ittle were “off camera”;
 
5.The 
warnings given by Officer Rutledge appear both audibly and visually on the video 
tape and prior to the actual statement;
 
6.The 
Defendant indicated that he understood Officer Rutledge’s warnings and that he 
wished to waive the rights set out in the warnings by his execution, on the 
video tape, of a written warning sheet which was admitted into evidence at the 
hearing as State’s Exhibit 6;
 
7.The 
video tape equipment that was used was capable of making an accurate recording 
of the Defendant’s statement;
 
8.The 
operator of the equipment was competent in operating the equipment;
 
9.The 
video taped recording is accurate and there is no evidence that the video tape 
has been altered;
 
10.All 
voices on the video tape are identified either directly or by observing the 
persons on the video tape as they speak; and,
 
11.Counsel 
for the Defendant was given a proper copy of the video taped statement in a 
timely fashion as required by Article 38.22, Section 3(5) of the Code of 
Criminal Procedure.
  
        Based 
on the trial court’s written findings, Sanchez’s argument that no express 
waiver appears on the videotape lacks merit. Even had the videotape not 
contained an express waiver of his rights, his argument would still fail because 
the law does not require that the recording reflect an express waiver of rights. 
See Rocha v. State, 16 S.W.3d 1, 12 (Tex. Crim. App. 2000); Etheridge 
v. State, 903 S.W.2d 1, 16 (Tex. Crim. App. 1994), cert. denied, 516 
U.S. 920 (1995).
        With 
regard to the interrogation tactics used by the police, Sanchez complains (1) 
that he was interrogated over two days for prolonged periods of time,[9] (2) that he was kept from his wife and family, (3) that 
the police denied him the right to call his wife, (4) that the police lied to 
him about fingerprints on Anderson’s wallet, (5) that the police lied to him 
about three witnesses who would testify that Sanchez had admitted killing 
Anderson, (6) that the police admitted that they attempted to “intimidate” 
him, and (7) that the police threatened to charge his wife with a crime if he 
failed to cooperate. Sanchez’s first three arguments fail to persuade us that 
his confession was involuntary because the officer who took Sanchez’s 
statement testified that the interrogation lasted only twenty minutes; thus, any 
deprivation he claims lasted only momentarily. Sanchez’s contentions that the 
police lied to him and that they admitted that they attempted to intimidate him 
are insufficient, under the totality of circumstances presented here, to render 
his otherwise voluntary confession inadmissible.  See Green v. State, 
934 S.W.2d 92, 99 (Tex. Crim. App. 1996) (stating that misrepresentations made 
by police to suspect during interrogation are a relevant factor in assessing 
whether confession was voluntary, but are insufficient to render an otherwise 
voluntary confession inadmissible), cert. denied, 520 U.S. 1200 (1997). 
Moreover, the mere fact that the police may have used trickery or deception by 
threatening to charge Sanchez’s wife with a crime if he failed to cooperate 
also does not make his statement involuntary unless the method used was 
calculated to produce an untruthful confession or was offensive to due process. See 
Creager v. State, 952 S.W.2d 852, 856 (Tex. Crim. App. 1997). Here, the 
record as a whole does not demonstrate that Sanchez’s confession became 
involuntary because of the tactics used by the police.
        Sanchez 
further contends that his age[10] and his borderline 
intellectual functioning prevented him from being able to freely and voluntarily 
confess to killing Anderson. Our review of the record, as discussed above with 
Sanchez’s first point, shows that Sanchez was mentally capable of making a 
knowing, intelligent, and voluntary waiver of his constitutional rights. See 
Green, 934 S.W.2d at 100-01 (holding confession voluntary where appellant, 
who had prior experience in criminal justice system, was eighteen when he made 
confession, and his records showed that he was of average intelligence).
        Because 
the trial court is the sole judge of the credibility of the witnesses and the 
weight of their testimony, we hold that the trial court’s findings and 
conclusions are supported by the record. See Wyatt, 23 S.W.3d at 25. 
Viewing the totality of the circumstances, we hold that the trial court did not 
abuse its discretion in finding Sanchez’s confession to be freely and 
voluntarily made. See id.; Walker v. State, 842 S.W.2d 301, 303 
(Tex. App.—Tyler 1992, no pet.). We overrule Sanchez’s third point.
V. Conclusion
        Having 
overruled each of Sanchez’s three points, we affirm the trial court’s 
judgment.
   
  
                                                          SUE 
WALKER
                                                          JUSTICE
 
  
PANEL 
A:   CAYCE, C.J.; WALKER and MCCOY, JJ.
 
DO 
NOT PUBLISH
Tex. R. App. P. 47.2(b)
 
DELIVERED: 
August 5, 2004


NOTES
1.  
See Tex. R. App. P. 47.4.
2.  
378 U.S. 368, 84 S. Ct. 1774 (1964).
3.  
On cross-examination, Dr. Morris admitted that Sanchez revealed during his 
interview that he had installed a transmission in his truck, could change 
engines in other vehicles, was able to use public transportation and telephone 
directories, handled his own finances, participated in hobbies like fishing and 
hunting, and visited friends approximately three times a week.
4.  
The record demonstrated that Dr. Mears, a professor of psychology at the 
University of Texas at Tyler, had a Bachelor of Science degree in psychology, a 
Master’s of Science degree in psychology, a Ph.D. in educational research and 
measurement and psychometry, a Ph.D. in neuropsychology, and a 
psychopharmacology degree.  He completed a school psychology 
internship.  Dr. Mears was a licensed psychologist and a board-certified 
neurophysiologist.  He ran his own private practice, which involved 
evaluating criminal defendants for the State and performing evaluations of their 
mental state or mental competency.
5.  
Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 113 S. Ct. 2786 
(1993).
6.  
Dr. Mears explained that he could not give Sanchez the same intelligence tests 
that Dr. Morris gave Sanchez because ideally one would wait a considerable time 
before regiving the tests.  Moreover, Dr. Mears stated that, in his 
opinion, “it could be a very major disadvantage to [Sanchez] to regive the 
test.”
7.  
See Tex. R. App. P. 38.9; see 
also Bee v. State, 974 S.W.2d 184, 186-87 (Tex. App.—San Antonio 1998, no 
pet.) (describing the practice of construing points of error liberally in order 
to adjudicate justly, fairly, and equitably rights of litigants).
8.  
As a juvenile, Sanchez was convicted of theft of a habitation.
9.  
We note that the police interrogated Sanchez when he was not in custody on July 
13, 2001, and he gave three video statements at that time.  However, those 
statements do not contain the confession at issue here.  Therefore, we 
focus our analysis solely on the July 14, 2001 confession.
10.  
Sanchez was nineteen at the time he gave his confession.